UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

            -against-                                                        09 Crim. 0656 (LAK)

VICTOR GUZMAN,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION**



        Appearances:


                        Jason B. Smith
                        Ryan Poscablo
                        Elie Honig
                        Assistant United States Attorneys

                        PREET BHARARA
                        UNITED STATES ATTORNEY

                        Christopher J. Gunther
                        Richard Rothblatt
                        SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
                        *Attorneys for Defendant.*


LEWIS A. KAPLAN, *District Judge.*

        On April 29, 2009, seven law enforcement officers from the New York State Police

("NYSP"), the New York City Police Department ("NYPD"), and the Drug Enforcement Agency

("DEA") entered an apartment inhabited by the defendant, Victor Guzman, and his girlfriend Jenny

Peña – both undocumented aliens – and their child.  Also present in the apartment were Ms. Peña's brother, Peter Campos, and his child.  While Campos spoke at least some English, Guzman and Peña spoke only Spanish.  As far as the record discloses, Investigator Jason Robles of the NYSP was the only officer who spoke or understood Spanish.[1]

The law enforcement agents were in the apartment for around three hours and conducted an extensive search.  They ultimately found crack cocaine, a scale, small plastic bags, and a drug press in a hidden compartment in a closet in one of the apartment's bedrooms and a bottle of lactose on a shelf in another room.  They obtained incriminating statements from Guzman as well.

Guzman was indicted for possessing with intent to distribute approximately 350 grams of crack cocaine in violation of 21 U.S.C. § 841(b)(1)(A) and now moves to suppress the physical evidence seized and his inculpatory statements.  The police claim that they were invited into the apartment and given consent to search.  They contend also that Guzman made the statements voluntarily after receiving proper *Miranda* warnings.  Guzman claims that the law enforcement agents coerced his consent to search and that the statements were the fruit of the unlawful search and were obtained in violation of *Miranda*.

On June 24, 2010, the Court held an evidentiary hearing.  Investigator Robles and DEA Special Agent Joseph Mercurio, who were among the officers who were in the apartment, testified, as did Guzman and Peña.  Their testimony conflicts sharply.  Robles' testimony in important respects is not corroborated by Mercurio, at least partly because Mercurio does not speak Spanish.  Robles' testimony, moreover, is inconsistent in part with his own prior accounts of what

---

[1]    Hearing Transcript ("Tr.") at 56.

transpired in the apartment.[2]  The testimony of Guzman and Peña was impeached in some respects also, and parts of Peña's testimony were patently incredible.

It is quite likely that no outsider ever will know exactly what happened in that apartment.  Having considered the evidence, including the demeanor and credibility of the witnesses, this Court makes the following findings.

*Facts*

The law enforcement officers received a tip that a robbery crew was going to break into 442 West 160 Street, Apartment 1C, to steal a substantial quantity of narcotics and a firearm.[3]  They staked out the apartment for most of the day in the hope of catching the crew in the act.[4]  Although they observed the supposed robbers near the apartment, the suspected robbers never attempted to break in and left the vicinity.[5]  At the end of their shift, the law enforcement officers decided to knock on the apartment door to see whether they could obtain consent to search, perhaps

---

[2]
    For example, the government stipulated that Robles told the United States Attorney's Officer ("USAO") that he told Guzman that "everyone gets charged" if drugs are found in the apartment.  Stipulation ¶ 2.  Robles testified, however, that he said that everyone "can" or "could" be charged if drugs were found.  Tr. at 37-38, 68.  Similarly, the government stipulated that Robles told the USAO that he found a bottle of lactose before he asked for permission to search the apartment.  Stipulation ¶ 3.  Robles, however, testified that he found the lactose after he received Guzman's consent to search the apartment.  Tr. at 27.

[3]
    *Id.* at 4-8, 47, 74.

[4]
    *Id.* at 5, 75.

[5]
    *Id.*

find the drugs and weapon they had been told were there, and make an arrest.[6]

The apartment has six rooms.[7]  Immediately opposite the entryway is the kitchen, which is the only room visible from the door.  A hallway extends to the right from inside the entrance.  The remaining four rooms are off the hallway.  The room closest to the kitchen is the living room.  Next is a bedroom that belonged to a tenant named Julia, who lived in the apartment with Peña and Guzman but was not present that day.  Adjacent is the bedroom that Peña and Guzman shared.  At the end of the hallway is a bedroom that formerly may have been inhabited by a man named Charlie.  On April 29, 2009, however, it contained a computer, a television, and numerous articles belonging to Guzman and Peña.  It is referred to as the "computer room" and is where the drugs ultimately were found.[8]  The remaining room is a bathroom.

*Entrance and Security Sweep*

Some time after 6:00 p.m., Investigator Robles knocked on the apartment door, identified himself as a law enforcement officer, and asked permission to enter.[9]  Peña and Campos answered the door and allowed the seven agents inside.  Peña told Robles that she lived in the apartment with her boyfriend, their child, and another woman.[10]  At least one of the agents had his

---

[6]     *Id.* at 51-52.

[7]     GX 13.

[8]     *Id.*

[9]     Tr. at 6-8, 75.

[10]     *Id.* at 11.

weapon visible.[11]

The officers asked Guzman, Peña, and Campos to enter and remain in the kitchen. One officer stayed with them. The others immediately conducted a security sweep of the apartment.[12] No apartment occupant consented to the security sweep.[13]

*The Lactose Bottle*

During the security sweep, Robles noticed a white bottle on a shelf in the Guzman-Peña room.[14] Based on his training and experience, he suspected it contained lactose, a substance commonly used to "cut" or dilute narcotics.[15] But he could not see the label and could not be sure.[16] He therefore removed it from the shelf and found that the label identified the contents as lactose.[17]

*Consent to Search*

At some point after discovering the lactose bottle, Robles confronted Guzman about

---

[11]     *Id.* at 54.

[12]     *Id.* at 54, 96, 136.

[13]     *Id.* at 55, 96.

[14]     *See* Stipulation ¶ 3; Gov't Br. at 2.

[15]     Tr. at 27-29.

[16]     *Id.*

[17]     *Id.* at 27.

it.  The conversation began in the hallway outside of Julia's room, but eventually proceeded inside.[18]
Robles asked Guzman if the lactose bottle was his.[19]   Guzman denied any knowledge of it.[20]

Robles then asked Guzman if he would consent to a search of the apartment.[21]
Guzman orally agreed to a search of his room and said that he was not responsible for anything in
Julia's room.[22]

Not satisfied with the limited oral consent, Robles asked Guzman to sign a written
consent to search form.  Guzman initially refused.[23]  Robles then conveyed to Guzman, either
directly or through Campos or Peña, that the police would arrest everyone in the apartment if
Guzman did not sign the consent form and the police found drugs in the apartment.[24]   Guzman

_____

[18]
      *Id.* at 13, 21-22, 58, 96-98.

[19]
      *Id.* at 29.

[20]
      *Id.*

[21]
      Stipulation ¶ 3; Tr. at 56-58; Gov't Br. at 2.

[22]
      *Id.* at 15, 56-58.

[23]
      *Id.* at 96.

[24]
      *See id.* at 97, 139; Stipulation ¶ 2.  The Court finds that both Guzman's and Peña's
testimony about the details is not entirely consistent or credible.  Guzman testified that, in
order to pressure him to sign the consent form, Robles brought a crying Campos into Julia's
bedroom to tell Guzman that the law enforcement officers would "take" everyone present
in the apartment if they found drugs.  By contrast, Peña testified that the officers took her
into Julia's bedroom to convince Guzman to sign.  *Compare* Tr. at 97 *with* Tr. at 139, 148.
Nevertheless, it is persuaded that Robles pressured Guzman to sign the consent form, in
part by the threat described in the text.

thereupon agreed to sign the consent form.  Robles read each paragraph to Guzman in Spanish.[25]

Guzman signed the form, which describes the area to be searched as "442 W 160TH ST APT 1C."[26]

The written consent form did not limit consent to Guzman's room or areas.[27]

*The Search*

The officers then conducted a lengthy and thorough search of the apartment.

Guzman, Peña, and Campos all were in the living room during the two to three hours the law

enforcement agents searched the apartment.[28]  More than one officer stayed with them in the living

room, at least one standing at the door.[29]

Eventually, Robles found a hidden compartment inside the closet in the computer

room.[30]  The compartment contained several bags of crack cocaine, empty plastic bags, a scale, and

a drug press.[31]  Robles then had Guzman brought to the computer room for questioning.[32]

---

[25]
> *Id.* at 25, 123-24.

[26]
> GX 1; Tr. at 23, 97.

[27]
> GX 1.

[28]
> Tr. at 98.

[29]
> *Id.* at 99, 140-41.

[30]
> *Id.* at 33; GX 10-11.

[31]
> Tr.at 33; GX 12.

[32]
> *Id.* at 58, 64.

*The Interrogation*

When Guzman was brought to the computer room, he initially was alone with Robles although Mercurio was present as well at some later points.[33]  Guzman sat in a chair at the computer table facing the closet where the drugs were found while Robles sat across from him next to the bed.[34]

Robles asked Guzman, who had not yet been told of the discovery of the drugs in the closet, whether there were any narcotics or firearms in the apartment.[35]  Guzman replied that he did not sell or have drugs and that he worked hard in painting and construction.[36]  Robles again told Guzman that everyone present would be charged if he found drugs in the apartment.[37]  Guzman asked Robles to clarify whether everyone would be charged,[38] and Robles replied affirmatively.[39]

Robles then showed Guzman a form containing *Miranda* warnings in English and in Spanish.[40]  The form, government exhibit 2, contains two columns each with six numbered

---

[33]

      *Id.* at 20.

[34]

      *Id.* at 34, 37, 65-66.

[35]

      *Id.* at 37.

[36]

      *Id.*

[37]

      Stipulation ¶ 2 ("Robles advised Guzman, in substance and in part, that if drugs were found in the Apartment, the way the law is, everyone gets charged[.]").

[38]

      *Id.*

[39]

      *Id.*

[40]

      GX 2; Tr. at 39-40.

9

paragraphs.  The left column is in English and the right one is in Spanish.  The first five paragraphs describe the warnings mandated by *Miranda*.  Each concludes by asking whether the reader understands the right described.  The sixth asks whether, having been advised of the rights in the first five paragraphs, the reader is willing to answer questions.

Guzman acknowledged that he understood each of the warnings in the first five paragraphs by writing "si" – yes – and his initials next to each one.  He indicated, however, that he did not wish to speak with the officers by answering "no" to the sixth paragraph, and signing the form.[41]

After Guzman indicated that he did not wish to speak with the law enforcement officers, Robles and Guzman continued talking in Spanish.[42]  During this conversation, Robles showed Guzman the drugs he had found and told Guzman that he and Peña would be arrested and deported, and that another family would raise their child, if Guzman did not take responsibility for the drugs.[43]  Officers placed Peña in handcuffs and took her toward the front door of the apartment.[44]  At that point, Guzman asked Robles to write the statement on the bottom of the *Miranda* warning form, which, in substance stated that the drugs were his.[45]  Guzman then signed the statement and

---

[41]

GX 2; Tr. at 70, 128.

[42]

Tr. at 71, 129.

[43]

Tr. at 86-87, 102, 131.

[44]

*Id.* at 103.

[45]

*Id.* at 71, 87; *see* GX 2.

was arrested.[46]

*Discussion*

A.     *The Lactose Bottle*

Guzman moves to suppress the lactose bottle as having been seized pursuant to an unlawful warrantless search of the apartment.

The Fourth Amendment bars unreasonable searches and seizures.[47]  A warrantless search of a residence is "*per se* unreasonable under the Fourth Amendment" unless it falls within an exception to the general rule.[48]  One such exception is for a "protective sweep" – a "quick and limited search of premises" in order to protect the safety of police officers and others.[49]  Protective sweeps incident to arrest are permitted under the Fourth Amendment,[50] and the Court of Appeals has extended that reasoning to non-arrest cases as well.[51]  In all cases, the officers conducting such a sweep must have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an

---

[46]     Tr. at 42-43.

[47]     *Koch v. Battleboro*, 287 F.3d 162, 166 (2d Cir. 2002) (citing *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995).

[48]     *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)).

[49]     *Maryland v. Buie*, 494 U.S. 325, 327 (1990).

[50]     *Id.* at 336-37.

[51]     *United States v. Miller*, 430 F.2d 93, 99-100 (2d Cir. 2005).

individual posing a danger to those on the arrest scene."[52]

It is unnecessary to pass on the constitutionality of the protective sweep in this case. Even assuming, without deciding, that the protective sweep was valid, Robles' actions with respect to the lactose bottle were not.  Although Robles was suspicious of the bottle, the label was not visible to him.  He learned that the bottle contained lactose only when he took it down from the shelf and examined it.  As he confirmed on the stand, the bottle was "just a bottle" until he did so.[53]  The movement and examination of the bottle was not necessary to protect the safety of the officers or anyone else.  In consequence, it was an unreasonable search.[54]  The lactose bottle must be suppressed.

B.      *The Physical Evidence from the Computer Room*

Guzman seeks also to suppress the physical evidence found in the hidden compartment in the computer room closet on the ground that it was discovered in violation of the Fourth Amendment.  The government argues that Guzman consented to the search and that the items discovered and seized were within the scope of the search he authorized.

Warrantless searches are reasonable, and therefore permissible under the Fourth Amendment, if conducted pursuant to the voluntary consent of one whom law enforcement officers

---

[52]

*Id.* at 97 (quoting *Buie*, 494 U.S. at 334).

[53]

Tr. at 27.

[54]

*Arizona v. Hicks*, 480 U.S. 321, 324-35 (holding that officer's "moving of" stereo equipment to read serial numbers constituted a search).

reasonably believe has the authority to give it.[55]  Where consent is the basis for a warrantless search, the government bears the burden of proving by a preponderance of the evidence that the consent was voluntary.[56]

Voluntariness is a factual inquiry determined by reference to the totality of the circumstances.[57]  "Account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."[58]  Relevant considerations include also whether "the defendant was in custody and in handcuffs, whether there was a show of force, whether the agents told the defendant that a search warrant would be obtained, whether the defendant had knowledge of the right to refuse consent, and whether the defendant previously had refused to consent."[59]  More than "acquiescence in a show of authority" is necessary to establish voluntariness.[60]  The fact that an individual is in custody or has been subjected to a display of force

---

[55]

    *Florida v. Jimeno*, 500 U.S. 248, 250-51 (1991) ("[W]e have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permtited to do so."); *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (holding that consent makes warrantless search reasonable); *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) (holding that consent by one reasonably believed to have authority to do so satisfies Fourth Amendment); *Garcia*, 56 F.3d at 422-23.

[56]

    *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968); *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006).

[57]

    *Snype*, 441 F.3d at 131 (quoting *Schneckloth*, 412 U.S. at 227).

[58]

    *Schneckloth*, 412 U.S. at 229.

[59]

    *United States v. Lavan*, 10 F. Supp.2d 377, 384 (S.D.N.Y. 1998) (Kaplan, J.) (collecting cases).

[60]

    *Id.* (quoting *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993)).

however does not preclude such a finding.[61]

      The atmosphere in the apartment to a reasonable person in Guzman's position was objectively coercive.[62]  Seven law enforcement officers, at least one with a firearm visible, were in the small apartment along with three adults and two children.  Upon their initial entry, the officers fanned out and swept the premises without consent.  At least two of the adults – Guzman and Peña – were undocumented aliens subject to deportation.  Robles discussed the bottle of lactose that he had found with Guzman and, in a small bedroom, said that he would arrest and charge all of the apartment's occupants if Guzman did not consent to a search of the premises for additional narcotics and drugs nonetheless were found.[63]  Guzman signed the consent form immediately after Guzman made that threat.

      The temporal proximity between Robles's threat and Guzman's consent underscores the coercive nature of the threat.  Prior to the threat, Guzman had agreed orally to a limited search, but had refused to sign the consent form.  When Robles threatened to arrest all of the apartment's occupants, however, Guzman immediately signed a written consent to an unrestricted search of the

---

61

      *Id.* (citing *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004)).

62

      *See United States v. Isiofia*, 370 F.3d 226, 232-33 (2d Cir. 2004) (affirming district court finding that consent was not voluntary where agents "demanded" defendant's consent and told him that if he refused he "would be jailed and deported and never see [his] family again.").

63

      The Court recognizes the tension between the demand for a signed consent and the threat to make arrests of all occupants if Guzman did not sign and drugs nonetheless were found. The former perhaps could be construed to imply that no search would be conducted absent consent while the latter suggests that a search would be conducted regardless of a signed consent.  But the tension does not persuade the Court that Robles did not make these statements as the Court has found.  Among other things, Guzman already had given oral consent to a limited search.  Moreover, a reasonable person in his position could not have been expected to know the legal significance of a signed consent form.

whole apartment.  The strong probability is that the threat, in the entire context of what was occurring, and not Guzman's sober reflection on the costs and benefits of agreeing to a search, tipped the balance.[64]  Moreover, while not dispositive,[65] Guzman never was informed that he could refuse to consent.

        Relying primarily on two cases from this district, the government argues that "it is permissible for officers to encourage one individual to claim ownership over contraband in order to avoid the possibility that loved ones will be found responsible for illegal property."[66]  Those cases easily are distinguishable.  In one, the government sought consent in exchange for a promise not to arrest, charge, or prosecute the defendants' loved-ones.[67]  Here, by contrast, the government explicitly threatened to arrest everyone in the apartment unless Guzman consented to a search.[68]  In the other, law enforcement agents obtained the defendant's consent to search after remarking that

---

[64]

        *Cf. United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006) (finding consent obtained after SWAT team home invasion and officers raised possibility of child being placed in protective care voluntary when consent was provided after time had passed and coercive atmosphere had dissipated).

[65]

        *Schneckloth*, 412 U.S. at 248-49.

[66]

        Gov't Br. at 6; Gov't Post-Hearing Br. at 8-9.

[67]

        *United States v. Memoli*, 333 F. Supp. 2d 233, 236-38 (S.D.N.Y. 2004) (finding no coercion where police told defendant that they would not pursue case against his girlfriend if he consented to search).

[68]

        *See United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998) (finding consent involuntary because, *inter alia*, the police "made statements to the effect that if [the defendant] did not sign a consent form, everyone in the house, including [the defendant's] girlfriend . . . would go to jail, and that [the defendant's] child would be taken into government protective custody."); *United States v. Bolin*, 514 F.2d 554 (7th Cir. 1975) (finding consent involuntary when produced by "an implied threat that if the consent were not signed the [girlfriend] would be arrested").

anyone inside a house found to contain drug money *could* go to jail.[69]  Robles here, on the other hand, threatened that he *would* in fact arrest everyone in the apartment unless Guzman consented to a search.  A threat actually to arrest everyone is substantially more coercive than the statement that it might be possible to do so.

Robles's threat to arrest all of the apartment's occupants would have been highly coercive to a reasonable individual in Guzman's position.  Guzman's consent to search was a direct consequence of it and of all the circumstances in which it was uttered.  Accordingly, the government has failed to carry its burden that Guzman voluntarily consented to the search.  The physical evidence obtained from it must be suppressed.[70]

C.    *The Statements*

Guzman seeks to suppress also inculpatory statements that he made to Robles inside the apartment after the search, some of which were made before and some after he was given his *Miranda* warnings.  He argues that all of the statements were the fruit of the unlawful search and were obtained in violation of *Miranda*.

1.    *Poisonous Fruit*

The Fourth Amendment's exclusionary rule requires suppression of evidence obtained as "fruit" of an illegal search in order to deter lawless conduct by law enforcement agents

---

[69]     *United States v. Perez*, 198 F. Supp. 2d 406,414-15 (S.D.N.Y. 2002).

[70]     In light of this holding, it is unnecessary to consider whether the search exceeded the authorized scope.

and prevent the use of unconstitutionally obtained evidence in federal courts.[71]  The Supreme Court

has declined to adopt a *per se* rule that "would make inadmissible any evidence . . . which somehow

came to light through a chain of causation that began" with a Fourth Amendment violation.[72]  Courts

instead must evaluate "whether the connection between the lawless conduct of the police and the

discovery of the challenged evidence [was] so attenuated as to dissipate the taint."[73]  Evidence,

including statements, obtained subsequent to an unlawful search may be introduced when "the

causal link between a Fourth Amendment violation and a subsequent confession . . . is so long or

tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations

of the same type."[74]  Factors relevant to this attenuation analysis include (1) the administration of

*Miranda* warnings, (2) the temporal proximity between the Fourth Amendment violation and the

statements, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the

official misconduct.[75]  The burden of proving that the statements were sufficiently attenuated to

remove the taint from the unlawful search is on the government.[76]

---

[71]

*Brown v. Illinois*, 422 U.S. 590, 599 (1975); *Wong Sung v. United States*, 371 U.S. 471, 484-85 (1963).

[72]

*Mosby v. Senkowski*, 470 F.3d 515, 520 (2d Cir. 2006) (quoting *United States v. Ceccolini*, 435 U.S. 268, 276 (1978)) (alterations in *Mosby*).

[73]

*Id.* at 520-21(quoting *Ceccolini*, 435 U.S. at 273-74).

[74]

*Id.* at 521 (quoting *United States v. Singh*, 811 F.3d 758, 767 (2d Cir. 1987)) (internal quotation marks omitted).

[75]

*Id.* (citing *Brown*, 422 U.S. at 603-04); *United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994).

[76]

*Kaupp v. Texas*, 538 U.S. 626, 633 (2003); *Brown*, 422 U.S. at 604.

Those factors require suppression of Guzman's statements in this case.  First, virtually no time passed and no events intervened between the unlawful search and the inculpatory statements. Robles elicited Guzman's inculpatory statements in the room in which the narcotics had been found immediately after conducting the unlawful search of that room.  Indeed, Robles testified that he did not leave the computer room after he discovered the narcotics, but had Guzman brought to him there.  Once in the room, Guzman intentionally was seated while Robles questioned him in a position facing the closet that contained the hidden compartment in which the narcotics were discovered.  During this time, Robles gestured at the closet and, at some point, confronted Guzman with the narcotics and other physical evidence discovered during the unlawful search.

Moreover, Robles continued to exert pressure on Guzman.  He repeatedly told him that everyone in the apartment would be arrested if the officers found narcotics.  After Guzman invoked his right to remain silent, Robles told him that his girlfriend, Peña, would be arrested and that another family would raise their child unless he took responsibility for the narcotics.  As a consequence of this threat, Guzman signed the inculpatory statement at the bottom of the *Miranda* form.

The only factor possibly favoring the government is Robles's administration of *Miranda* warnings.  This fact, of course, is no help to the government for Guzman's pre-*Miranda* statements.  And it does not support a finding of attenuation for the post-*Miranda* statements in these circumstances either.

"Miranda warnings, *alone* and *per se*, cannot always make the act sufficiently a product of free will to break, for Fourth Amendment purposes, the causal connection between the

illegality and the confession."[77]  The *Miranda* warnings here did not break the chain of causation between the unlawful search and inculpatory statements.  Guzman initially invoked his right to remain silent.  That invocation was overcome at least in part by Robles's threats to arrest and deport the defendant's family if drugs were found.  The close temporal proximity between the unlawful search, the warnings, the threats, and the subsequent inculpatory statements is evidence of the fact that the *Miranda* warnings did not break the chain of causation.

Accordingly, the government has failed to satisfy its burden that Guzman's pre- and post-*Miranda* inculpatory statements were sufficiently attenuated from the unlawful search, and the statements must be suppressed.

*2.*      Miranda

Guzman's statements would be suppressed even if they were attenuated from the unlawful search, as they were obtained in violation of *Miranda v. Arizona*[78] and its progeny.

In order to protect the Fifth Amendment right against self-incrimination, *Miranda* requires law enforcement agents to warn suspects about their rights prior to questioning.[79]

---

[77]
    *Kaupp*, 538 U.S. at 633 (quoting *Brown*, 422 U.S. at 603); *Thompson*, 35 F.3d at 106.

[78]
    384 U.S. 436 (1966).

[79]
    *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (police must warn a suspect "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.") (quoting *Miranda*, 384 U.S. at 479).

Absent those warnings, the government may not use a suspect's statements in its case in chief.[80] *Miranda*'s protections apply, however, only if the suspect is "in custody."

The Court of Appeals recently has adopted a two step objective test to determine whether a suspect was in custody at the time the statements were made.[81]   The first step requires consideration of whether a reasonable person in the defendant's position would have understood that he or she was free to leave.[82]   Among the factors relevant to this determination are whether the suspect is told that he is free to leave, the location and atmosphere of the interrogation, the language and tone used by the law enforcement officers, whether the suspect is searched or frisked, and the length of the interrogation.[83]   The second step, and the "ultimately inquiry,"[84] looks to whether there was a restraint of freedom of movement akin to that associated with a formal arrest.[85]

>       a.       *Pre-*Miranda *Statements*

In all the circumstances, a reasonable person in Guzman's position would not have

---

[80]

>       *Newton*, 369 F.3d at 668 (citing *Miranda*, 384 U.S. at 479, and *Dickerson v. United States*, 530 U.S. 428, 443-44).

[81]

>       *Newton*, 369 F.3d at 671-72.

[82]

>       *Id.* at 670

[83]

>       *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998); *see also Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984)*; Oregon v. Mathiason*, 429 U.S. 492, 494-95 (1977); *Campaneria v. Reid*, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989)*; United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir. 1987).

[84]

>       *Newton*, 369 F.3d at 670.

[85]

>       *Id.*

felt free to leave.  Seven law enforcement agents, at least one displaying a firearm, searched his small apartment for two to three hours.  During most of that period, Guzman was confined to the living room.  At least one officer watched over him, Peña and Campos at all times.  He was not told that he was free to leave the apartment.  At Investigator Robles's request, Guzman was brought to the computer room for interrogation.  The apartment's atmosphere also was hostile.  Robles repeatedly threatened to arrest and deport Guzman and his girlfriend Peña.  He threatened also to separate them from their child.

The conclusion that a reasonable person in Guzman's position would not have felt free to leave is further supported by his immigration status.  Guzman is an undocumented alien.  A reasonable person in his position would have known that he or she is subject to deportation and would not have felt free to walk away from the police or to ask them to leave the apartment.

These facts indicate also that Guzman was restrained to a degree associated with formal arrest.  Significantly, the agents moved Guzman from the living room to the computer room at Robles's direction, sat him in a specific chair identified by Robles, and faced him in a specific direction for the interrogation.  These actions demonstrate an ability to control Guzman's movement akin to that that the officers would have had had he been placed under formal arrest.

In these circumstances, Guzman was in custody while in the computer room.  Consequently, any pre-*Miranda* warning statements must be suppressed.

### b.    *Post*-Miranda *Statements*

Guzman seeks to suppress also the statement written at the bottom of the *Miranda*

form[86] which essentially says that any drugs in the apartment belonged to him.

A suspect may waive his *Miranda* right to remain silent, but must do so voluntarily, knowingly, and intelligently.[87]   The waiver may be effectuated by speaking with police.[88]   Once a suspect has invoked the right to silence, however, the police must stop questioning and "scrupulously honor" that decision.[89]   The government does not dispute that Guzman invoked his right to silence by answering "no" to the *Miranda* form's final question.[90]

Immediately prior to being advised of his rights, Guzman had answered Robles's questions in the computer room.  Robles then showed Guzman the *Miranda* form and explained it to him.  Guzman initialed each paragraph on the form, and indicated that he was not willing to speak with the officers.  At that point, Robles was obliged to stop questioning Guzman.  He did not. Robles and Mercurio remained in the computer room with Guzman, and Guzman and Robles continued to talk in Spanish.  At some point, Robles showed Guzman the drugs and told Guzman that he and Peña would be arrested for the drugs they had found in the apartment.  The agents also handcuffed Peña and took her toward the apartment's front door.  In response, Guzman directed Robles to write the statement at the bottom of the *Miranda* form in which he claimed responsibility

---

86

GX 2.

87

*Maryland v. Shatzer*, 130 S. Ct. 1213, 1219 (2010) (citing *Miranda*, 384 U.S. at 475).

88

*See Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *North Carolina v. Butler*, 441 U.S. 369, 375-76 (1979).

89

*See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2274 (2010); *Edwards*, 451 U.S. at 484-85; *United States v. Plugh*, 576 F.3d 135, 143 (2d Cir. 2009) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

90

*See* Gov't Post-Hearing Br. at 20; *see also* GX 2.

22

for the drugs.

As the law enforcement agents did not "scrupulously honor" Guzman's right to remain silent, the *post-Miranda* statement on the bottom of the *Miranda* form must be suppressed.

*Conclusion*

For the foregoing reasons, Guzman's motion to suppress the physical evidence seized pursuant to the search of his apartment and the inculpatory statements he made to Robles in the computer room and on the bottom of the *Miranda* form [DI 30]  is granted in all respects.  The government shall advise the Court promptly whether it intends to proceed to trial.

The foregoing are the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:      July 14, 2010



Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)